LUCY C. FARNSWORTH and others, appellants,

*vs.*

THE LIME ROCK RAILROAD COMPANY.

Knox. Opinion April 21, 1891.

*Corporations. Railroads. Charter. Acceptance. Amendment. Eminent Domain. Location. Land Damages. Const. of Maine, Art. IV. Part 3, § 14.*

The constitutional amendment which took effect in 1875, requiring the formation of corporations to be under general statutes, does not apply to a charter granted by the legislature before the amendment, although amended by it afterwards.

The four years, at the expiration of which a charter of incorporation becomes by the statute forfeited unless the company be organized and its business commenced within that time, do not run against a corporation observing the statutory requirement within that time after its charter has been amended. The amendment is a legislative waiver of any forfeiture.

A petition praying county commissioners to assess damages for land taken for a railroad, need not aver the inability of the parties to agree on the amount of damages, although the charter of the railroad confers jurisdiction on the commissioners in case the parties cannot agree on the amount. The presumption is that they cannot agree.

A railroad charter may be considered as presumptively accepted at its date without any record evidence of the fact, when it appears that the grantees afterwards asked for and obtained amendments to their charter and have fully constructed the road.

The right of eminent domain is available by legislative grant to a railroad corporation which has constructed a railroad for the carriage of freight to and from the lime kilns in Thomaston and Rockland, and goods to and from stores in the latter place, connecting with the Knox and Lincoln railroad and running over a portion of its track under a contract between the two corporations, being eight miles in length, of standard guage, operated by steam power, and costing nearly a half million dollars obtained from the sale of stock and bonds.

ON REPORT.

The Lime Rock Railroad Company having applied to the County Commissioners for Knox County by petition, dated June 18, 1888, to assess the damages caused by their taking the lands of the appellants, under their charter, for railroad purposes, notice was accordingly given. The appellants appeared under protest, moved to have the petition dismissed; and reserving all objections, &c., denied the Commissioners' jurisdiction and contested their right to act upon the petition for the following, among other reasons :—

"That under the constitution and laws of Maine, the said company was not and is not a corporation, and under said laws not authorized to procure a condemnation of said land in any form.

"That the individuals or company doing business under the name of the Lime Rock Railroad Company have never duly organized as a corporation under said constitution and laws.

"That the alleged railroad which said individuals or company propose to construct across the respondents' land is not for such use as gives them the right or authority under said laws to procure a condemnation thereof; and that they had not filed any location of said road in form or substance as required by law, before the date of this petition.

"That whether said petitioners are a corporation or not, all of the proceedings taken to obtain title to or right to cross said premises are under the said constitution and laws of Maine invalid.

"That said company has no right to construct a railroad over respondents' land, and that said company has no right or authority under said laws to procure a condemnation of land for that or any other purpose."

After the view and a hearing, the Commissioners overruled the motion to dismiss and made, on October 17, 1888, an award of the damages sustained by the appellants, who took their appeal to the Supreme Judicial Court.

*J. H. Montgomery and W. H. Fogler,* for appellants.

Counsel cited upon the questions of legal corporate existence, public use, and compliance with all conditions necessary for the power of eminent domain, the following cases: *In re, Brooklyn, W. & N. Ry. Co.* 72 N. Y. 245; Const. of Maine, Art. 4, Pt. 3, § 14; *Id.* § 13; R. S., c. 51; *Oregon Ry. Co.* v. *Oregonian Ry. Co.* 130 U. S. 1; Stat. 1864, c. 333; Stat. 1873, c. 333; Morawetz Corp. § § 6, 14, 16, 316, 648; *State* v. *Bull*, 16 Conn. 179–191; *Coffin* v. *Collins*, 17 Maine, 440; *R. R.* v. *Smith*, 47 Maine, 34; *U. S.* v. *Dandridge*, 12 Wheat. 70; *Middlesex Soc.* v. *Davis*, 4 Met. 133; *Lincoln & Ken. Bank* v. *Richardson*, 1 Maine, 79; *Dartmouth College* v. *Woodward*, 4 Wheat. 688; 1 Redf. Railways, 70; *State* v. *Dawson*, 16 Ind. 40; R. S., c. 1, § 26; Stat. 1871, c. 185; Stat. 1887, c. 137; *San Francisco* v. *Water Works*, 48 Cal. 493; *St. Paul Ins. Co.* v. *Allis*, 24 Minn. 75; *Katzenberger* v. *Aberdeen*, 121 U. S. 172; *Comanche Co.* v. *Lewis*, 133 U. S. 198; Stat. 1889, c. 418; *Talbot* v. *Henderson*, 16 Gray, 417–421 *Nickolson's Succession*, 37 La. An. 346; *Thomas* v. *West Jersey R. R.* 101 U. S. 71; Cooley Con. Lim. 669; *Wadells' Appeal*, 84 Pa. St. 90; *Wild* v. *Deig*, 43 Ind. 455; *Bankhead* v. *Brown*, 25 Iowa, 540; *Memphis Freight Co.* 4 Coldw. (Tenn.) 419; *In re, Eureka Co.* 96 N. Y. 42; *Consol. Channel Co.* v. *R. R.* 51 Cal. 269; *Warner* v. *Martin*, 21 W. Va.

534; *R. R. Co.* v. *Iron Works,* 2 Lawyer's Rep. No. 5; *Gilman* v. *Lime Point,* 18 Cal. 229; *Castor* v. *The Tide Water Co.* 3 C. C. Green (N. J.), 54; Opinion, DICKERSON, J. 58 Maine, 593, 605; *Gas Light Co.* v. *Richards,* 63 Barb. 437; *In re, Union Ferry Co.* 98 Ind. 139, 153; *Reeves* v. *Treasurer,* 8 Ohio, 333; *In re, Association,* 66 N. Y. 569; *Salt Co.* v. *Brown,* 7 W. Va. 191; *Sharp* v. *Speir,* 4 Hill, 76; *Spofford* v. *R. R.* 66 Maine, 39: *Water Co.* v. *Water Co.* 80 Maine, 363; *R. R.* v. *McComb,* 60 Maine, 295; *Gilman* v. *Lime Point,* 19 Cal. 47; *Ritenburgh* v. *R. R.* 21 Penn. St. 100; *Leavitt* v. *Eastman,* 77 Maine, 117, 120; *R. R.* v. *Smith,* 47 *Id.* 46.

*C. E. Littlefield,* for defendants.

Charter constitutional. *Com.* v. *Breed,* 4 Pick. 460; *Bankhead* v. *Brown,* 25 Iowa, 540; *Talbot* v. *Hudson,* 16 Gray, 422. Public use: *Jordan* v. *Woodward,* 40 Maine, 324; Cooley's Const. Lim. pp. 657–6, 659; Mills Em. Domain, § 12; Pierce, R. R. 143; *Talbot* v. *Hudson,* 16 Gray, 423–425; *Gt. Falls M'fg. Co.* v. *Fernald,* 47 N. H. 444; *Olmstead* v. *Camp,* 33 Conn. 352; *Patterson* v. *Boom Co.* 3 Dill. C. C. 465; *Head* v. *Amoskeag M'fg. Co.* 113 U. S. 893; *Vennard* v. *Cross,* 8 Kans. 261; *Hand Gold Mining Co.* v. *Seawell,* 11 Nev. 394; *Bloodgood* v. *R. R.* 8 Wend. 13; *Gas Co.* v. *Richardson,* 63 Barb. 437; *Tide Water Co.* v. *Coster,* 18 N. J. Eq. 518, citing *Beekman* v. *R. R.* 3 Paige, 73; *Ross* v. *Davis,* 97 Ind. 79; *McQuillan* v. *Hatton,* 42 Ohio 202; *Brown* v. *Beatty,* 34 Miss. 240; *Cotton* v. *Boom Co.* 22 Minn. 372; *R. R.* v. *Greely,* 17 N. H. 47; *Shaver* v. *Starrett,* 4 Ohio, 494; *Sherman* v. *Brick,* 32 Cal. 241; *Brewer* v. *Bowman,* 9 Ga. 37; *Mt. Wash. R. R.* 35 N. H. 134; *Bonaparte* v. *R. R.* 1 Baldw. 223; *Gilman* v. *Lime Point,* 18 Cal. 229; *Seacombe* v. *R. R.* 23 Wall. 108; *Tyler* v. *Beacher,* 44 Vt. 648; *Freight Co.* v. *Memphis,* 4 Coldw. 419; *Harvey* v. *Lloyd,* 3 Barr. (Penn.) 331; *Shoenberger* v. *Wall,* 8 Barr. 146; *Harvey* v. *Thomas,* 10 Watts, 63; *Hayes* v. *Ricker,* 32 Pa. St. 169; *Cent. Coal Co.* v. *Georges Creek Co.* 37 Md. 537; *Phillips* v. *Watson,* 63 Iowa, 28; *W.*

*Va. Transp: Co.* v. *Oil Co.* 5 W. Va. 382 ; *De Camp* v. *R. R.* 47 N. J. L. 43 ; *Perrine* v. *Farr*, 2 Zab. 356, 363 ; *Allen* v. *Stevens*, 5 Dutch. 509, 511.

PETERS, C. J.   The charter of the railroad company, whose acts are called in question in this controversy, was granted by the legislature in 1861, amended in 1873 and again in 1889. The location was filed and the road built in 1888.

It is argued against its legality, that the original charter became lost by non-acceptance before the constitutional amendment of 1875, requiring railroad and other corporations to be formed under general laws, and that any act of revivor passed since 1875 is unconstitutional, in view of decisions of the Supreme Court of the United States, and especially by force of the doctrine of the case of *Oregon Ry. Co.* v. *Oregonian Ry. Co.* 130 U. S. 1.   The charter and amendments were expressly accepted by the corporation in 1889, but the facts clearly enough indicate an implied acceptance before that time, and prior to the date of the constitutional amendment.   This court has held that no vote of the corporation is necessary, and that acceptance may be implied by circumstances.   *Smith* v. *Railroad*, 47 Maine, 34.   The charter in question is for peculiar purposes, and no class of persons but those incorporated would want it.   The charter was asked for,— not tendered to them.   They desired it for future use, hoping and expecting all the time that the day would be at hand when the road would be built.   A very strong evidence of acceptance is that in 1873, they applied for an amendment of the charter.   Subsequent events confirm that evidence.   The fact of spending several hundred thousand dollars in constructing the road confirms it.   Late events show the earlier intention.

The constitutional amendment does not apply to legislative amendments of charters granted before 1875.   The legislature having granted a charter before 1875 may amend it after that date, the amendment being germane to the original act.

A further objection urged against the validity of the charter is that the company was not organized within four years after

the date of its incorporation, forfeiture following for such lapse by the provision of R. S., ch. 1, § 6, article 26. The answer is that the legislature waived forfeiture by the amendments which it granted.

It is objected against the validity of the proceedings of the corporation, in its application to have the land damages · ascertained, that the application does not allege that the parties themselves could not agree upon the amount of damages, the charter providing for an assessment in case of disagreement. The presumption is that parties cannot agree who do not agree. Were the proceedings at common law, it would be proper pleading to insert in the petition a negative averment to satisfy the condition embodied in the charter. But it would hardly seem necessary in proceedings before county commissioners, and if it were, the omission could readily be supplied by amendment.

The question of the case, evidently, is whether the principle of eminent domain applies to the purposes for which the charter was granted. Is it an enterprise where the public good is sufficiently subserved to justify the condemnation of private property by the corporation, under legislative permission for its use?

There must be enterprises occupying such middle ground on this question, so near to the boundary line between public use and private use, that it may be difficult to say on which side of the line the facts would place them. There must be instances at either extreme and all the way between extremes. We think the enterprise designed by the company which is virtually the party in this case, though not so significant an example as many railroad enterprises, falls on the side of public use. It is of that stamp.

It is not deniable that a scheme may be more profitable to private owners than it is valuable to the public, and still be a public enterprise. Capitalists are not expected to embark in enterprises which are of public concern unless there be an adequate private gain. It has frequently been determined that the public use may be limited to place and persons. Not many,

compared with the great body of men, participate directly in the use of the telegraph and telephone, the common sewers, public ferries, or the railroads. A street railroad may be a benefit to some persons and work an injury to others. But the community as a body are benefited by such enterprises.

Great liberality has prevailed in granting the use of the public power for the construction of railroads and all kinds of ways. The statutes of our State afford facilities for laying out town ways and private ways, and go so far as to confer power on municipal officers to lay out over private land winter-ways simply for the transportation of merchandise, hay and grain, and lumber.

The charter of the Lime Rock Railroad Company declares the purpose of the corporation to be "the transportation of limestone from the quarries in the city of Rockland and town of Thomaston to the various lime-kilns in said city and town, together with other freight, with convenient branches to accommodate such kilns, including all quarries and kilns now opened or that may be hereafter opened in said city and town." And there are general provisions such as are usually inserted in railroad charters, concerning organization, rates, obligations and liabilities to be assumed.

The road is not designed to carry passengers, it is said. Neither is a street railroad designed to carry freight, each being, however, a common carrier in its sphere. It is also said by counsel that the charter does not provide that the road shall begin or end at any railroad or highway, and that we cannot go beyond the charter to ascertain that such *termini* were intended. We should suppose that details of location would not usually be inserted in a charter. While exact designs are not paraded in the charter itself, they are supposed to have been sufficiently represented to the legislature as a justification for its action.

The plan of location produced as a part of the case, shows that the road connects with the Knox & Lincoln railroad, running over a portion of its track, crossing several highways in the course of its route, running in the rear of numerous stores in Rockland and making close connections with them for delivery of

freight, entering the city of Rockland at its south end and terminating at the north end, so as to become a link in a projected line of railroad running northerly to Camden and elsewhere.

It has a transportation contract with the Knox & Lincoln Railroad Company for a term of years. The road is eight miles in length, to be ten to twelve miles when completed, of standard guage, is operated by steam power, has a capital stock of $300,000 and a bonded indebtedness of $200;000, has in present use two locomotives and two hundred and sixty-five freight cars, and transports rock from forty-five different quarries, owned by seventy-five persons and firms. When completed the capacity of the road and its business will be very much increased, and the road is designed to reach every kiln and quarry in the vicinity of its general route. The public usefulness of such an enterprise may be seen at a glance. The city of Rockland and town of Thomaston are greatly benefited thereby. It will give development and add value to the principal business of the two places, and increase the prosperity of their people.

We have not deemed it best to fortify our positions by authorities, being content to cite a single case, like this case in some respects, but occupying a position considerably in advance of the doctrine promulgated in this opinion. *Talbot* v. *Hudson*, 16 Gray, 417. In that case the general question is thoroughly examined.

> *The case to stand for the assessment*
> *of damages.*

WALTON, VIRGIN, LIBBEY, HASKELL and WHITEHOUSE, JJ., concurred.